UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| WILLIAM C. HAYWOOD<br><br>    Plaintiff,<br><br>-vs-<br><br>CITY OF EL PASO, TEXAS, GREGORY K. ALLEN, MICHAEL P. OTERO, ISAAC GUEVARA, KEVIN MCKINNEY, MARIA DE LA PAZ GONZALEZ, RUBEN ESCAJEDA, JACOB C. KIESEL, and JOHN AND JANE DOE SUPERVISORS (A-Z), JOHN AND JANE DOE OFFICERS (A-Z), all individuals being sued in their personal, individual and official capacities,<br><br>    Defendants. | CASE NO.: 3:20-cv-00114-PRM |

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

ROOK ELIZABETH RINGER, ESQ.
**LENTO LAW GROUP, P.A.**
222 San Marco Ave., Ste. "C"
St. Augustine, FL 32084
904.602.9400 x 467 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*

**COMES NOW** the Plaintiff, WILLIAM C. HAYWOOD (hereinafter, the "Plaintiff"), by and through his undersigned attorneys, complaining of Defendants, and respectfully alleges as follows:

## JURISDICTION AND VENUE

1.      This is a civil rights action in which the Plaintiff seeks relief for the violation of his rights secured by 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments.

2.      Jurisdiction of this Court is found upon 28 U.S.C. § 1331 and 28 U.S.C. § 1391.

3.      This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

4.      The events that gave rise to this lawsuit took place in El Paso, Texas.

5.      Venue is appropriate in the Western District of Texas pursuant to 28 U.S.C. § 1391(b) since the individual Defendants are employees of the El Paso Police Department and City of El Paso and the acts providing the legal basis for this Complaint occurred in El Paso, Texas.

## PARTIES

6.      Plaintiff, William C. Haywood, is a citizen of El Paso, Texas.

7.      Defendants are all, upon information and belief, Texas municipal entities and/or individual members of law enforcement agencies, in an appointed or

elected capacity.

8. Defendant City of El Paso operates the El Paso Police Department, a law enforcement agency, and is a municipality capable of being sued under Texas law. The City of El Paso is the legal entity responsible for the El Paso Police Department. The Plaintiff bases all applicable and appropriate claims as to the Defendants City of El Paso and El Paso Police Department on the doctrines of respondeat superior or vicarious liability, and municipal liability pursuant to Monell v. Dep't of Soc. Services of City of New York, 436 U.S. 658 (1978).

9. Defendant Gregory K. Allen (hereinafter, "Allen") was at all times relevant, the Chief of Police of the El Paso Police Department, and an official who policymaker for the City of El Paso and had a legal obligation to act in conformity with the United States and Texas Constitutions and other applicable federal and state laws. Allen is sued in his personal, official, and individual capacities and at all times relevant to this Complaint was acting within this scope and course of his employment with the City of El Paso and the City of El Paso Police Department. At all times relevant to this Complaint he was acting under color of the laws of the State of Texas and the City of El Paso.

10. Defendant, Michael P. Otero[1] (hereinafter, "Otero") is employed by the

---

[1] Due to the nature of the injuries suffered by the Plaintiff as detailed within, the Plaintiff was only able to determine the name of Officer Otero, but the identities of the other officers involved was determined from official police reports.

El Paso Police Department as a law enforcement officer in the City of El Paso and was acting under the color of state law. He is sued in his personal, official, and individual capacities pursuant to applicable law.

11.     Defendant, Isaac Guevara (hereinafter, "Guevara") is employed by the El Paso Police Department as a law enforcement officer in the City of El Paso and was acting under the color of state law. He is sued in his personal, official, and individual capacities pursuant to applicable law.

12.     Defendant, Kevin McKinney (hereinafter, "McKinney") is employed by the El Paso Police Department as a law enforcement officer in the City of El Paso and was acting under the color of state law. He is sued in his personal, official, and individual capacities pursuant to applicable law.

13.     Defendant, Maria de la Paz Gonzalez (hereinafter, "Gonzalez") is employed by the El Paso Police Department as a law enforcement officer in the City of El Paso and was acting under the color of state law. She is sued in her personal, official, and individual capacities pursuant to applicable law.

14.     Defendant, Ruben Escajeda (hereinafter, "Escajeda") is employed by the El Paso Police Department as a law enforcement officer in the City of El Paso and was acting under the color of state law. He is sued in his personal, official, and individual capacities pursuant to applicable law.

15.     Defendant, Jacob C. Kiesel (hereinafter, "Kiesel") is employed by the

El Paso Police Department as a law enforcement officer in the City of El Paso and was acting under the color of state law. He is sued in his personal, official, and individual capacities pursuant to applicable law.

16. Defendants John and Jane Doe Supervisors A-Z (hereinafter, the "John Doe Supervisors") are law enforcement supervisors employed by the El Paso Police Department in the City of El Paso and were acting under the color of state law. They are sued in their personal, official, and individual capacities pursuant to applicable law.

17. Defendants John and Jane Doe Officers A-Z (hereinafter, the "John Doe Officers") are law enforcement officers employed by the El Paso Police Department in the City of El Paso and were acting under the color of state law. They are sued in their personal, official, and individual capacities pursuant to applicable law.

18. Collectively, the Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers will be referred to as, the "Officers".

## FACTUAL BACKGROUND

### I. THE ACTIONS SURROUNDING THE ATTACKS AGAINST THE PLAINTIFF.

### THE APRIL 27, 2018 ARREST

19. On the night of April 27, 2018, the Plaintiff was driving his vehicle when law enforcement officers attempted to stop him for what turned out to be

expired paper tags.

20.    At that time, and due to the fact that he had been drinking alcohol prior to the stop, the Plaintiff panicked and sped away from the officers.

21.    However, the Plaintiff accidentally crashed into either a stop sign or a pole approximately four blocks away.

22.    Pursuant to the commands of the Officers, the Plaintiff then got out of the vehicle and put his hands up.

23.    Next, pursuant to further commands of the Officers, the Plaintiff turned around and placed his hands behind his head.

24.    At this point, one of the Officers came up behind him and wrapped an arm around the Plaintiff's neck, choking him and making him unable to breathe.

25.    Next, another of the Officers kicked the Plaintiff's legs out from under him in order to effectuate some kind of "take-down".

26.    Due to the Officer's "take-down", the Plaintiff was forced face-first into the sidewalk and street pavement, with the full weight of the Officer bearing down upon him.

27.    The Plaintiff could head multiple other of the Officers approaching and shouting.

28.    Although the Plaintiff was securely incapacitated and face first on the ground, the Officers approached and started also kicking and punching him (with

closed fists) in the face.

29.     One of the Officers handcuffed the Plaintiff, at which time another Officer then kicked him hard in the right side of his ribs.

30.     At this point, the Officers grabbed the Plaintiff by the head and neck and slammed his face into the sidewalk, causing some of the Plaintiff's teeth to fly out of his mouth.

31.     The Officers continued slamming the Plaintiff into the sidewalk until he passed out.

32.     When the Plaintiff awoke, he was in great pain, as his face and body had been severely beaten.

33.     The Plaintiff attempted to lift his face up, but states that, "it felt glued to the sidewalk".

34.     Eventually, the Plaintiff raised his head up and determined that his face was in a puddle of drying blood, creating the feeling of being "glued" to the sidewalk.

35.     One Officer asked the Plaintiff why he "ran".

36.     The Plaintiff truthfully responded that he did not "run" or attempt to "run", as he followed the orders of the Officers to stand and put his hands up.

37.     The Officer then stated to the Plaintiff that the Plaintiff had "run" because he had a knife on him.

38.    The Officer then threw down in front of the Plaintiff a common pocket-knife that was not owned, carried, or known by the Plaintiff.

39.    The Officer then said it was because of the knife that he ran, "or was it because [he] had a gun?"

40.    At this point, the Plaintiff stated that he did not have any knife or gun or anything else illegal.

41.    The Officer then angrily responded, "You have whatever I say you have!"

42.    At that point, the Plaintiff was then carried away by medics who placed him in an ambulance.

43.    The Plaintiff was rushed by ambulance to University Medical Center in El Paso, Texas (hereinafter, "University Medical Center").

44.    At around this point, the Plaintiff first realized that his front teeth had been knocked out by his face having been slammed into the sidewalk by the Officers.

45.    At University Medical Center's emergency room, the Plaintiff was treated for his wounds and he was subjected to magnetic resonance imaging (i.e., an "MRI") to determine if he had any broken ribs.

46.    The Plaintiff also received stitches on his lips and eyebrows, and given intravenous medications for the extreme pain that he was in.

47.    There were two police officers in the room with him, Otero and another

Officer, and the Plaintiff verbally expressed his displeasure with the excessive force that had been used upon him to this point.

48.     At that point, one of the Officers approached the Plaintiff and punched him three (3) times on the left side of his face and eye.

49.     During the battery, a Nurse[2] (hereinafter, the "Nurse") walked in and immediately rushed out.

50.     The Plaintiff pleaded with the Nurse for help, as she had previously been tending to his wounds, but the Nurse left and did not return for approximately five (5) minutes.

51.     When the Nurse returned, she told the Plaintiff to "shut up or it will get worse."

52.     The Plaintiff was eventually released and placed in a police car to be taken to the northeast El Paso Police Department sub-station, located at 9600 Dyer St, El Paso, TX 79924 (hereinafter, the "Sub-Station").

53.     While being placed in the police car, the Officers again choked the Plaintiff and punched him.

54.     As a result of the repeated choking attacks by the Officers, the Plaintiff was having difficulty breathing when he arrived at the Sub-Station.

55.     Due to his difficulty breathing, the Plaintiff was again removed by

---

[2] The Plaintiff describes the Nurse as a white woman in her late 30s/early 40s, with red hair.

ambulance, this time to Las Palmas Del Sol urgent care clinic (hereinafter, the "Clinic") at 10640 Gateway Blvd. North, 79934, where he was treated for a few hours, approximately from 5:00AM to 7:00AM on April 28, 2018.

56.     After being released from the Clinic, the Plaintiff was taken to the Downtown Detention Facility, located at 601. E. Overland, El Paso, TX 79901 (hereinafter, the "Downtown Jail").

57.     Over the next five to six days, the Plaintiff was treated for his wounds, until such time that the Plaintiff was able to be bonded out on bail.

58.     The Plaintiff suffered the following injuries as a result of the 2018 Arrest:

     a.     Two black eyes;
     b.     Stitches on his eye brow and lower lip;
     c.     Three (3) missing front teeth;
     d.     Skin torn off of his right forearm by abrasion;
     e.     Bruised ribs;
     f.     Bruised left leg; and
     g.     Bruises on shoulders and back.

**AFTER THE PLAINTIFF'S RELEASE FROM THE DOWNTOWN JAIL**

59.     Almost immediately after being released, the Plaintiff complained to the El Paso Police Department's Internal Affairs Department (hereinafter, "Internal Affairs") and filed charges against Otero and the other Officers.[3]

---

[3] The Plaintiff's memories as to the specifics of each Officer's names are understandably less than optimal, considering the facts of this case and his injuries.

60.     The Plaintiff gave statements to the Internal Affairs Officer, and pictures were taken of his wounds.

61.     Due to the severity of his injuries, as well as the time spent in jail, the Plaintiff missed approximately three (3) weeks of work.

62.     He had been working prior to the arrest as an irrigation pipe layer for Bowen Ranch, located at 5101 Stan Roberts Ave., El Paso, Texas, 79934 (hereinafter, "Bowen Ranch").

63.     The Plaintiff attempted to return to work, but due to the injuries he sustained in the 2018 Arrest, he was physically unable to do his job as before, and he was laid off.

64.     On or about November of 2018, the Plaintiff was notified that the internal affairs case had been "closed" by someone from Internal Affairs.

## THE APRIL 27, 2019 ARREST

65.     On April 27, 2019, exactly one year after the first arrest, Otero again pulled over the Plaintiff, this time claiming that his vehicle's taillight was inoperable (hereinafter, the "2019 Arrest").

66.     The Plaintiff disputes that the taillight was not working, and states that it was in working order at that time.

67.     Otero then asked for the Plaintiff's driver's license and insurance, which he provided.

68.     Approximately one (1) minute later, six (6) more police vehicles arrive, at which point the Plaintiff was personally searched, and he was then thrown or pushed down by Otero, Kiesel, or other Officers to sit on the curb.

69.     The Officers, including both Otero and Kiesel, did not find any illegal substances or contraband to support their search.

70.     However, Otero and the Officers then placed the Plaintiff under arrest for not having a front license plate on his vehicle, which is normally an approximately $31.00 ticket, rather than an arrestable offense.

71.     The Officers then placed the Plaintiff in a police vehicle and booked him again at the Downtown Jail.

72.     Additionally, the Officers seized and impounded the Plaintiff's vehicle, a 2005 GMC Yukon Denali, as well as approximately $16,200.00 in cash that he had on his person at the time of the arrest.

73.     During the arrest and transport to the jail, the Plaintiff was again "pushed around" and "punched" by the Officers, but it was not at a level approaching the severity of the 2018 Arrest.

74.     At some point during the arrest, Otero stated something to the effect of, "You file charges on us, this is what happens. Don't mess with the Northeast Gang Unit!"

75.     The Plaintiff suffered the following injuries as a result of the 2018

Arrest:

      a.    Bruised wrist;
      b.    Fractured right pinky finger; and
      c.    Bruises on neck and arm.

## II. THE EL PASO POLICE DEPARTMENT'S CUSTOM, POLICY, AND/OR PRACTICE OF USING EXCESSIVE FORCE.

76. The policies, practices, and/or customs of the El Paso Police Department constituted moving forces of the unconstitutional conduct that proximately caused the injuries and deprivations of constitutional rights to the Plaintiff. El Paso Police Department fails to discipline officers who use excessive deadly or intermediate force against El Pasoans in general and when they are on notice of a victim's mental health crisis. The El Paso Police Department fails to properly train officers with respect to excessive force and internal investigations, at the very least. All of these policies were the moving force of the constitutional violations that resulted in the attacks on the Plaintiff.

77. The El Paso Police Department also has a persistent and widespread practice of officers using excessive deadly or intermediate force; using excessive deadly or intermediate force against El Pasoans when they are on notice of a victim's possible gang affiliations; and using excessive force against El Pasoans generally. These practices are so widespread that they constitute a custom that fairly represents municipal policy and are so obvious that they demonstrate the El Paso Police Department policymaker's deliberate indifference toward El Pasoans' constitutional

rights.

78.     The policymaker responsible for all policies, practice, or customs listed below is Police Chief Gregory Allen (hereinafter, "Defendant Allen"). Defendant Allen is a decision-maker who possesses final authority to establish municipal policy with respect to the actions of the El Paso Police Department. El Paso Police Department policy and City law designate him as the final authority on all matters of policy, operations, and discipline of the El Paso Police Department.

### THE EL PASO POLICE DEPARTMENT'S FAILURE TO DISCIPLINE OFFICERS FOR USE OF EXCESSIVE FORCE.

79.     First, the City has a policy of failure to discipline or investigate cases involving excessive deadly force.

80.     Discipline of all officers for any citizen complaint is the decision of the policymaker, Defendant Allen. He makes these decisions with the recommendation of a Disciplinary Review Board (hereinafter, the "DRB").

81.     The DRB takes action by a majority vote on whether or not to find that an officer's actions are outside policy and the sanction to apply.

82.     All decisions by the DRB are subject to the discretion of Defendant Allen who may reverse or mitigate discipline as he sees fit.

83.     The DRB is comprised of officers and a few civilians. At times over the last ten years, the DRB has had no civilian members at all. At most, the DRB had

two to three civilian members – which was nowhere near close to enough to sway the Board's decisions.

84.     The makeup of the DRB ensures that officers will always comprise a majority of its members creating a built-in bias in favor of the officers.

85.     This make-up and Defendant Allen's overriding authority has resulted in an atmosphere in which officers accused of excessive force almost uniformly do not face sanctions.

86.     Upon information and belief, of the cases brought to the DRB from 2012 to 2016, less than 10% of those cases resulted in any action by the DRB against the officer.

87.     Of that 10%, nearly every officer in question only received counseling, including those found to have engaged in excessive force, as a consequence for their actions – which does not go on their disciplinary review card.

88.     Defendant Allen also regularly mitigates discipline against officers engaged in the excessive use of force contrary to the recommendation of the DRBs.

89.     Defendant Allen has continued to implement a DRB where membership consistently comprises a majority of law enforcement officers knowing that this composition leads to less accountability for officers engaged in the excessive use of force.

90.     A DRB with a majority of civilian members not on El Paso Police

Department payroll would ensure the independence of the DRB and reduce impunity for officers involved in excessive force incidents.

91. By maintaining a DRB that lacks independence, El Paso Police Department's disciplinary policy allows officers to use excessive force and to specifically use excessive intermediate and deadly force where officers are on notice of a victim's alleged gang affiliation without suffering any disciplinary action.

92. The DRB stands in stark contrast to other well-known models where there is more independent and meaningful oversight of police conduct because the review boards do not include members who work for law enforcement agencies, such as the Independent Police Oversight Board in Houston.

93. Defendant Allen's failure to properly discipline officers engaged in excessive use of force is obvious and has caused the disproportionately high incidents of excessive use of force and excessive use of intermediate and deadly force.

94. Specifically, this failure to discipline actually caused the excessive use of intermediate and deadly force against the Plaintiff.

95. Defendant Allen persisted in his failure to discipline his officers for excessive use of force and excessive use of intermediate and deadly force in situations involving persons alleged to have gang affiliations, in knowing disregard that such a failure presents an obvious risk that constitutional violations will occur.

For these specific reasons, this failure to discipline was the moving force that caused the constitutional violation at issue.

## USE OF DEADLY OR INTERMEDIATE FORCE

96.     The above-mentioned policies have created a persistent and widespread practice of officers using excessive deadly or intermediate force.

97.     Defendant Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

98.     In the fifteen years prior to 2012, there had been at least thirty-two incidents reported in which El Paso police officers used excessive deadly force.

99.     Since that time, the number has jumped. From 2012 to 2016, based on a limited data set that does not include all instances, El Paso Police Department officers utilized excessive deadly or intermediate force at least twenty-one times – fourteen of which resulted in deaths.

100.   These rates are consistently higher than national rates.

101.   In 2015 alone, the per-capita rate of residents who died after being shot by El Paso Police Department officers was 90% higher than the national rate.

102.   From 2012 to 2016, 50% percent of total deaths in El Paso Police Department custody involved unarmed victims.

103.   The percentage of residents shot and killed by El Paso Police

Department officers involving unarmed victims in 2015 was 50% higher than the national percentage for the same year. In 2016, the percentage of residents shot by EPPD officers involving unarmed victims was over 250% higher than the national rate.

104.   Defendant Allen has had direct knowledge of these statistically high rates of the use of excessive deadly force and has acted with deliberate indifference to the consequences of these customs.

## USE OF FORCE AND INTERNAL AFFAIRS STATISTICS

105.   A limited review of citizen complaints and the El Paso Police Department's own reporting regarding the internal affairs unit, show a high rate of excessive force complaints reported by citizens against officers.

106.   Defendant Allen has had direct knowledge of this practice and has failed to discipline officers involved, train them, or otherwise remedy the problem.

107.   Upon information and belief, public data regarding citizens' complaints is extremely limited because the City has obfuscated efforts to obtain this information publicly.

108.   In its 2014 Annual Report, the El Paso Police Department stated that it had investigated 1,296 citizen complaints in that year, and internal affairs had investigated 2,092 cases, resulting in 51 sustained citizens' complaints, and 479 sustained internal investigations. As a result, it is reasonable to conclude that of the

2,092 cases alleging misconduct, 530 total (or 25%) of the cases were found to have shown misconduct on the part of El Paso Police Department officers.

109.   However, in the years 2015-2017, the El Paso Police Department withheld statistics regarding citizens' complaints, use of force, or internal affairs investigations from their annual reports.

110.   In its 2018 Annual Report, the El Paso Police Department claimed that it had received only 539 complaints, of which only 183 were assigned to internal affairs, and only 130 of which were actually closed. It also claimed a total of 816 use of force incidents.

111.   In its 2019 Annual Report, the El Paso Police Department stated that it had received only 455 complaints, 170 of which involved excessive force allegations, of which 166 were assigned to internal affairs, and only 150 of which were actually closed. However, **it also claimed a total of 3,124 use of force incidents**, which is approximately a 383 % increase from 2018.

112.   Upon information and belief, these statistics presented by the El Paso Police Department show that the statistics are being manipulated to present deceptive information to the public, and/or the El Paso Police Department is facing an exponentially expanding use of force activity in recent years, and is also likely mishandling citizens' complaints.

113.   The lack of willingness to produce accurate information makes it

difficult to conduct a comparative analysis of the City's excessive force complaints.

114.    Nonetheless, based on the limited data provided, it is possible to identify a trend of comparatively high uses of force among the El Paso Police Department, given that the total use of force incidents for 2019 dwarfs all prior years since Defendant Allen was appointed in 2008.

115.    Essentially, in 2019, using an approximation of 1,000 officers in the El Paso Police Department, **each officer was involved in an average of more than three (3) use of force incidents, yet only 150 internal affairs investigations were even *closed*, as opposed to the 2,092 internal affairs investigations closed in 2014**.

116.    Chief Allen's failure to discipline the officers involved, train them or otherwise remedy the problem, as well as his deliberate interference in the investigations by internal affairs, is the moving force in the constitutional violations that took place against the Plaintiff.

### POLICE CHIEF GREGORY ALLEN'S SIMILAR DISCIPLINARY HISTORY WITH THE GANG UNIT

117.    Some years ago, while Defendant Allen was a Sergeant and supervisor in the gang unit (also referred to as the "Gang Task Force", and hereinafter, the "Gang Unit"), the El Paso Police Department conducted an internal investigation report (IA92-174) involving Defendant Allen and several other El Paso police

officers, with respect to an incident from November 13, 1992 involving some students from Hanks High School.

118.    According to the police investigation, on November 13, 1992, El Paso police officers, including Defendant Allen, "went to Hanks High School to investigate a complaint of possible retaliation" against a police officer.

119.    A number of juveniles were transported to the police department's "Tactical Office" in order to take statements.

120.    According to the initial report, one of the juveniles became "belligerent with the officers and attempted to strike [Defendant Allen] in the facial area."

121.    The report adds that "[Defendant Allen] avoided the [subject]'s strike, and [Defendant Allen] struck the [subject] [redacted] in the face twice with an open hand."

122.    The initial police report adds that the Juvenile Probation Department would not accept the subject juvenile because he was complaining about "pain to the side of his face and his ear."

123.    Thereafter, the report concludes that the juvenile was transported to Thomason Hospital [now University Medical Care], where he was diagnosed with "two ruptured ear drums and a hairline fracture of the jaw."

124.    The police investigation focused on three issues in regard to [Defendant Allen], a sergeant at the time. They were whether Greg Allen "physically abused"

any of the complainants, did Greg Allen "verbally abuse" any of the complainants and did [Defendant Allen] "order the transportation of any of the juveniles in custody to the TAC Office".

125.   According to the investigative narrative, one of the juveniles stated that he was arrested on November 13, 1992 outside of Hanks High School.

126.   The juvenile stated that "[Defendant Allen] slammed his face against a car."

127.   Once at the TAC office, the juvenile adds that [Defendant Allen] "picked him up out of his chair and slapped him across both if his left and right ears."

128.   The juvenile continues that he was taken to a room where "[Defendant Allen] struck him with an open hand and also struck him in the jaw and chest and elbow."

129.   The report goes on to describe that after the juvenile was returned to his seat, sometime later, "[Defendant Allen] then returned and picked him up by the neck and threw him over a table, picked him up again and began squeezing his Adam's Apple and told him that he could kill him right now."

130.   The juvenile also added that [Defendant Allen] told him "that if he reported what happened that he would go to his home and if he had to go through the whole family, he would get him."

131.   [Defendant Allen] admitted to the investigators, "that he did have

physical contact with [redacted] in the room at the TAC Office."

132.    [Defendant Allen] added that he had uncuffed the juvenile and "was asking questions and [sic] one point he told [redacted] that he was a 'Goodamm Liar' [sic]."

133.    [Defendant Allen] added in his narrative that the juvenile "then jumped to his feet with his fist clutched and as he rose to meet him, [redacted] swung at him."

134.    In response to the alleged attack, [Defendant Allen] added that he "slapped [redacted] across the face once with his palm and once with the back of his palm, and then he grabbed him by the neck and pinned him to the wall."

135.    On March 25 and 26, 1993, the El Paso Police Department held a disciplinary hearing.

136.    The board members of conducting the hearing were Deputy Chief Gregory Drollinger, Deputy Chief Edward Ortega, Kevin Shannon and Dr. Nick Reyes.

137.    The board chairman was Assistant Chief Joseph Messer.

138.    According to the "Disciplinary Board Ballot", Defendant Allen faced four "issues":

1)  "Did [Defendant Allen] physically abuse Complainant [redacted] while in custody?"

2)  "Did [Defendant Allen] verbally abuse Complainants [redacted] and

Samuel Lujan while in his custody?"

3) "Did [Defendant Allen] transport juveniles in custody to a location not designated by the Juvenile Court, i.e. TAC Office?"

4) "Supervisory Dereliction"

139.  The first three issues were "sustained" by the board members, except for one board member, Ken Shannon, who did not believe that the actions described showed that Defendant Allen physically abused the juvenile.

140.  The board recommended a range of 2 to 10-day suspensions for Defendant Allen.

141.  The fourth issue was penciled in and sustained by one member of the investigative board.

142.  As a result of the investigation many of the officers that were involved were suspended without pay for their actions on that day.

143.  On June 3, 1993, Defendant Allen was suspended for five days.

144.  According to the memorandum, the suspension was the result of several violations, which are recounted here verbatim:

> On November 12, 1992, Det. John Eoff, who was assigned to the Tactical Division, was involved in an altercation with several subjects at the Arby's Restaurant, located at 10988 Montwood. On November 13, 1992, all three Tactical Division squads, including officers under your command, were organized and returned to the scene of the altercation in an attempt to locate the subjects. You [Defendant Allen] and two other police supervisors accompanied Tactical members to the scene and were present when the subjects were located. Several juveniles

and one adult were taken into custody for Disorderly Conduct. You [Defendant Allen] were aware that the Juvenile Court Judge had previously issued orders which specifically directed that peace officers can only transport juveniles in custody to an officially designated location, i.e. the Police Department Youth Services Division of the Juvenile Probation Department. In spite of this order you allowed subordinate officers to transport the juveniles directly to the Tactical Division offices and personally transported one of the juveniles. You failed to exercise appropriate supervisory control of the entire situation.

145.    The discipline memorandum lists the following disciplinary history for

Greg Allen.

1) "On February 5, 1987 you [Defendant Allen] were responsible for the careless discharge of a firearm which resulted in damage to City property. You further failed to report the incident to a supervisor in violation of the rules, regulations and procedures. You received a three day suspension."

2) "On September 19, 1992 you [Defendant Allen] were present at an eating establishment in which various units violated rules and regulations in regards to the number of units present at one time at an eating establishment. You [Defendant Allen] were counselled for your involvement."

3) "On July 8, 1992 you [Defendant Allen] were present at eating establishment with other officers in violation of rules, regulations and procedures regarding the number of police units at any one eating establishment. You had previously been counselled for a similar incident and for this incident you received a written reprimand."

146.    On June 17 through June 23, 1993, Defendant Allen took "vacation in

lieu of suspension".

## DEFENDANT ALLEN'S CONTEMPT FOR
## INTERNAL INVESTIGATIONS INTO POLICE

## MISCONDUCT

147.   In addition to his own rough history with internal affairs, Defendant Allen also has a history of policy decisions and public statements evincing his contempt for the process, and for the idea that police officers should be accountable for their own illegal actions.

148.   In 2008, Defendant Allen stopped forcing police officers to undergo lie detector tests during investigations into their conduct and called the lie detector tests "garbage".

149.   In 2016, Defendant Allen made a widely publicized statement where he referred to "Black Lives Matter", a decentralized coalition of organizations and individuals who focus on exposing illegal activities by law enforcement officers, as "a radical hate group".

150.   Defendant Allen's public comments about police accountability have been condemned by numerous notable public figures, including U.S. Rep. Beto O'Rourke, state Sen. José Rodríguez, state Reps. César Blanco, Joe Moody, Evelina Ortega, and Mary González, County Judge Veronica Escobar, as well as representatives for the NAACP and ACLU.

151.   Although numerous accounts of police misconduct have been filed against the El Paso Police Department, Defendant Allen has implemented policies and procedures, and has made public statements, which hamper, interfere, or stifle

any meaningful investigations, corrections of the behavior, or any reform whatsoever.

152.   Essentially, what Officers Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers did on April 27 and 28, 2018, and especially on April 27, 2019, was just a reflection of Defendant Allen's own conduct in the Gang Unit.

**COUNT I**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(Fourth Amendment – Excessive Force)**
**(Against Defendants Gregory K. Allen, Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, and John and Jane Doe Supervisors (A-Z), John and Jane Doe Officers (A-Z))**

153.   Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

154.   The Fourth Amendment prohibits law enforcement from using excessive force when effectuating an arrest.

155.   The Plaintiff did not pose any threat to the safety of any of the Officers or to the safety of any other civilians in either the 2018 Arrest or the 2019 Arrest.

156.   At all times relevant, Plaintiff had a clearly established right to liberty, including his right to personal safety and bodily integrity, as well as protection from unlawful seizure, unnecessary force, unreasonable force, and excessive force

pursuant to the Fourth Amendment to the United States Constitution.

157. The use of force against Plaintiff described herein was excessive, without legal justification, and not justified by the totality of the circumstances.

158. At all times relevant as law enforcement officers acting under color of law, Defendant Officers were required to obey the laws of the United States.

159. Defendants intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently injured, through the use of excessive force, the Plaintiff without any lawful basis.

160. Defendants' actions constituted excessive force.

161. The aforementioned acts deprived Plaintiff of the rights, privileges, and immunities guaranteed to citizens of the United States, and in violation of 42 U.S.C. § 1983.

162. As a proximate result of the illegal and unconstitutional acts of the Defendants, the Plaintiff was harmed and suffered damages for his physical injuries and their long-lasting after-effects, mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00.

## COUNT II
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Unlawful Detainment & Arrest)
### (Against Defendants Gregory K. Allen, Otero,

**Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers and John and Jane Doe Supervisors (A-Z), John and Jane Doe Officers (A-Z))**

163.    The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

164.    The Fourth Amendment requires police officers to have articulable reasonable suspicion before detaining a criminal suspect.

165.    The Fourth Amendment requires police officers to have probable cause before placing a criminal suspect under arrest.

166.    At all times relevant, the Plaintiff had a clearly established right to liberty, including his right to personal safety and bodily integrity, as well as protection from unlawful seizure, unnecessary force, and unreasonable force pursuant to the Fourth Amendment to the United States Constitution.

167.    At all times relevant, as police officers acting under color of law, the Officers were required to obey the laws of the United States.

168.    The Defendant Officers intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently detained, handcuffed and/or arrested the Plaintiff without a warrant or any lawful basis with respect to the 2019 Arrest.

169.    The Defendant Officers effectuated the traffic stop without having any

knowledge of any fact or circumstance which would lead a reasonable person to believe that Plaintiff had committed any offense, whatsoever.

170. The Defendant Officers intentionally detained and arrested the Plaintiff without a legally valid reason.

171. The Defendant Officers intentionally impounded the Plaintiff's vehicle, a 2005 GMC Yukon Denali, as well as approximately $16,200.00 in cash that he had on his person at the time of the 2019 Arrest.

172. The Defendant Officers' actions constituted an unlawful arrest of the Plaintiff.

173. The aforementioned acts deprived the Plaintiff of the rights, privileges, and immunities guaranteed to citizens of the United States by the Fourth and Fourteenth Amendments to the Constitution of the United States, and in violation of 42 U.S.C. § 1983.

174. As a proximate result of the illegal and unconstitutional acts of the Defendants, the Plaintiff was harmed and suffered damages for his physical injuries and their long-lasting after-effects, mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00.

## COUNT III
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Unlawful Search and Seizure)
**(Against Defendants Gregory K. Allen, Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers and John and Jane Doe Supervisors (A-Z), John and Jane Doe Officers (A-Z))**

175.   The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

176.   The Fourth Amendment requires police officers to possess sufficient probable cause or reasonable suspicion to search a criminal suspect or seize their personal property.

177.   The Defendant Officers intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently searched the Plaintiff's person and seized his personal property without his consent, a warrant, or any lawful basis.

178.   The Defendant Officers searched the Plaintiff's person and seized his personal property in violation of the Plaintiff's Fourth Amendment rights.

179.   At all times relevant, the Plaintiff had a clearly established right to liberty, including his right to protection from unlawful seizure pursuant to the Fourth Amendment to the United States Constitution.

180.   At all times relevant, as police officers acting under color of law, the Officers were required to obey the laws of the United States.

181. In violation of the Plaintiff's clearly established constitutionally-protected right to be free of unreasonable search and seizure without due process of law under the Fourth Amendment to the United States Constitution, the Defendant Officers unlawfully searched the Plaintiff's person and seized his personal property.

182. As a proximate result of the illegal and unconstitutional acts of the Defendants, the Plaintiff was harmed and suffered damages for his mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Malicious Prosecution)
**(Against Defendants Gregory K. Allen, Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers and John and Jane Doe Supervisors (A-Z), John and Jane Doe Officers (A-Z))**

183. The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

184. The Fourth Amendment requires police officers to possess sufficient probable cause before charging a criminal suspect with a crime.

185. The Defendant Officers intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently arrested the Plaintiff and initiated

criminal proceedings against him in connection with the 2019 Arrest, when they took him to jail and charged him as retaliation for the Plaintiff's Internal Affairs Complaint.

186.    The Defendant Officers' initiation of this criminal charge against the Plaintiff was done with malice and bad faith where Defendant Officers had no knowledge of any fact or circumstance which would lead a reasonable person to believe that the Plaintiff had committed any criminal offense, whatsoever.

187.    The Defendant Officers searched the Plaintiff's person and seized his personal property in violation of the Plaintiff's Fourth Amendment rights.

188.    At all times relevant, the Plaintiff had a clearly established right to liberty, including his right to protection from unlawful and malicious prosecution pursuant to the Fourth Amendment to the United States Constitution.

189.    At all times relevant, as police officers acting under color of law, the Officers were required to obey the laws of the United States.

190.    In violation of the Plaintiff's clearly established constitutionally protected right to be free of unlawful and malicious prosecution under the Fourth Amendment to the United States Constitution, the Defendant Officers unlawfully arrested and charged the Plaintiff.

191.    As a proximate result of the illegal and unconstitutional acts of the Defendants, the Plaintiff was harmed and suffered damages for his mental pain,

emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Retaliation for Protected Conduct)
**(Against Defendants Gregory K. Allen, Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers and John and Jane Doe Supervisors (A-Z), John and Jane Doe Officers (A-Z))**

192. The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

193. The Plaintiff engaged in constitutionally protected conduct when he asserted his right to formally press charges against Otero and other Officers via the Internal Affairs Complaint.

194. The Defendant Officers stopped, detained, searched, arrested, and charged the Plaintiff for engaging in the constitutionally protected conduct of filing the Internal Affairs Complaint against them.

195. In retaliation for this protected conduct, the Defendant Officers intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently arrested the Plaintiff and initiated criminal proceedings against him in connection with the 2019 Arrest, when they took him to jail and charged him as

retaliation for the Plaintiff's Internal Affairs Complaint, and without any lawful basis.

196.   In retaliation for this protected conduct, the Defendant Officers intentionally, knowingly, maliciously, recklessly, unreasonably, and/or gross negligently initiated excessive force against the Plaintiff in connection with the 2019 Arrest, and without any lawful basis.

197.   The Defendant Officers' arrest and charging of the Plaintiff was done with malice and bad faith where Defendant Officers had no knowledge of any fact or circumstance which would lead a reasonable person to believe that the Plaintiff had committed any criminal offense, whatsoever.

198.   The Plaintiff's retaliatory arrest was based on the Defendant Officers' knowing, deliberate, and reckless disregard for the truth, where Defendant Officers had no knowledge of any fact or circumstance which would lead a reasonable person to believe that the Plaintiff had committed any criminal offense, whatsoever.

199.   Such deterrent was intended to serve, and would serve, as a deterrent to any person of ordinary firmness from engaging in such protected conduct.

200.   The retaliation was motivated at least in part by the protected conduct.

201.   There was a causal connection between the Plaintiff's constitutionally protected conduct and the adverse retaliatory actions taken by the Defendant Officers against the Plaintiff.

202.   The Defendant Officers intentionally arrested the Plaintiff with the intention of confining him to the Defendants' custody, and with the intent of unlawfully imprisoning him in the Jail. The Defendant Officers' arrest and initiation of these criminal charges against the Plaintiff were done without consent, probable cause, legal justification, just cause, or any other legally valid reason.

203.   At all times relevant, the Plaintiff had a clearly established right to liberty, including his right to protection from unlawful and malicious retaliation pursuant to the Fourth Amendment to the United States Constitution.

204.   At all times relevant, as police officers acting under color of law, the Officers were required to obey the laws of the United States.

205.   As a proximate result of the illegal and unconstitutional acts of the Defendants, the Plaintiff was harmed and suffered damages for his mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment.

**COUNT VI**
**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**
**(Monell)**

**(Against Defendants City of El Paso, John Doe Supervisors, and Allen)**

206.   The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

207. Municipal bodies are liable for constitutional violations under 42 U.S.C. § 1983 when execution of its official policy or custom deprives an individual of its rights protected under the Constitution, pursuant to Monell v. Department of Social Services, 436 U.S. 658 (1978).

208. Such municipal liability exists where a city fails to properly train, supervise, and discipline its employees amounting in a deliberate indifference to one's constitutional rights.

209. At all times relevant, Defendants City of El Paso, John Doe Supervisors, and Allen had a duty to properly train, supervise, and discipline their employees and agents.

210. The Defendants City of El Paso, John Doe Supervisors, and Allen breached that duty, in part, by:

    a. improperly training, authorizing, encouraging or directing officers on proper use of force;

    b. failing to investigate allegations of excessive force;

    c. failing to discipline officers for violations of policy related to excessive force;

    d. ratifying officers' use of excessive force through failure to correct or discipline officers; and

    e. ratifying officers' use of excessive force through failure of internal

affairs to properly investigate excessive force claims.

f.  maintaining a policy or custom of excessive force by officers that is so common and widespread as to constitute a custom that fairly represents municipal policy;

g.  maintaining a policy or custom of officers' failure to avoid the use of deadly or intermediate force against individuals when the officer is not at risk of imminent serious bodily injury or death;

h.  failing to properly train or supervise members of the El Paso Police Department, including Defendants Officers, not to use intermediate or deadly force against an individual who does not place the officer or another at risk of imminent serious bodily injury or death;

i.  failing to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Defendants Officers, who have deprived citizens and residents of El Paso of their constitutional rights.

211.  The policy, pattern of practice, or custom of condoned misconduct is tacitly or overtly sanctioned, as evidenced by the conduct of Defendants Officers and the Defendants City of El Paso, John Doe Supervisors, and Allen's failure to train, supervise, investigate, and discipline any of the officers involved in the April 27, 2018 incident amounting in a deliberate indifference to the Plaintiff's

constitutional rights, as well as by the conduct of Defendants Officers and the Defendants City of El Paso, John Doe Supervisors, and Allen's ratification of the actions of the officers involved in this incident, by failing to ensure that the internal affairs unit was properly investigating and disciplining Defendants Officers, and by permitting Defendants Officers to conduct retaliatory actions like those described herein in the April 27, 2019 incident.

212.  This unconstitutional behavior of officers is carried out pursuant to a policy, pattern of practice, or custom, whether formal or informal, which violates the constitutional rights of persons situated such as the Plaintiff.

213.  Defendant Allen is a former member of the Gang Unit and has been himself suspended and reprimanded for excessive force violations eerily similar to those alleged herein.

214.  Defendant Allen has also made public statements denouncing people and organizations who complain about excessive force and other police misconduct.

215.  Even in light of Defendant Allen's behavior, Defendant City of El Paso has failed to remove Defendant Allen from his position as head of the El Paso Police Department, thereby ratifying, endorsing, approving, and formally assenting to his conduct, as well as the conduct of the El Paso Police Department in general.

216.  Furthermore, Defendants City of El Paso, John Doe Supervisors, and Allen allowed and/or directed the internal affairs unit to fail to prosecute or discipline

Defendants Officers, as well as allowing and/or directing the internal affairs unit to provide the officers who have become subjects of internal affairs investigations to have the knowledge, means, and opportunity to retaliate against the Plaintiff, and ratified, endorsed, and approved of the actions of Defendants Officers by failing to discipline Defendants Officers, in order to continue these kinds of actions by the Gang Unit.

217.   Defendants City of El Paso, John Doe Supervisors, and Allen failed to take sufficient remedial actions to end this policy, pattern of practice, or custom within the El Paso Police Department.

218.   The condoning, approval, endorsement, and ratification of misconduct, and the failure to end this policy, pattern of practice, or custom was a proximate cause to the injuries suffered by the Plaintiff.

219.   The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were adopted with deliberate indifference to the constitutional rights of citizens.

220.   The aforementioned customs, policies, practices, and procedures, the failure to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance

of wrongful conduct of the City of El Paso were a moving force and/or a proximate cause of the deprivations of the Plaintiff's clearly established and well settled constitutional rights under the Fourth amendment in violation of 42 U.S.C. §1983.

221.   Wherefore, as a direct and proximate cause of the actions of the Defendants City of El Paso, John Doe Supervisors, and Allen, the Plaintiff has suffered damages for his physical injuries and their long-lasting after-effects, mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00.

## COUNT VII
## VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983
### (Fourth Amendment – Duty to Intervene)
### (Against Defendants John Doe Officers & John Doe Supervisors)

222.   The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

223.   Plaintiff brings this claim under 42 USC § 1983 for violation of the Fourth Amendment of the U.S. Constitution.

224.   The use of force against Plaintiff by Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers was excessive.

225.    Defendants John Doe Officers and John Doe Supervisors had a duty to intervene and protect the Plaintiff but failed to do so.

226.    Wherefore, as a direct and proximate result of Defendants John Doe Officers and John Doe Supervisors' actions, the Plaintiff has suffered damages for his physical injuries and their long-lasting after-effects, mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00..

## COUNT VIII
### Intentional Torts: Assault, Battery, False Arrest, False Imprisonment, Intentional Infliction of Emotional Distress
**(Against Defendants Gregory K. Allen, Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers and John and Jane Doe Supervisors (A-Z), John and Jane Doe Officers (A-Z))**

227.    The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this claim.

228.    All of the individual Defendants named in this Complaint are officials, employees, deputies and/or agents of municipalities.

229.    All acts of the individual Defendants alleged above were conducted within the scope of the Defendants' employment or duties.

230.    The actions of the individual Defendants were willful, malicious and in

violation of the known rights of the Plaintiff.

231.   On April 27-28, 2018, Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers committed assault and battery upon the Plaintiff when they intentionally inflicted bodily harm by kicking, punching, and slamming the Plaintiff's face into the sidewalk several times.

232.   On April 27, 2019, Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers committed assault and battery upon Plaintiff by intentionally inflicting or attempting to inflict bodily harm by punching and pushing around the Plaintiff.

233.   Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers, without probable cause or articulated suspicion, handcuffed the Plaintiff and placed him in their police vehicle.

234.   Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers falsely imprisoned the Plaintiff in their police vehicle.

235.   The Plaintiff's false imprisonment continued as Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers transported the Plaintiff to the Downtown Jail.

236.   At all times, the Plaintiff knew he was imprisoned by Defendants Otero,

Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers.

237. Defendants Allen and John and Jane Doe Supervisors ratified, condoned, and approved of the conduct of the Defendant Officers.

238. The Defendant Officers' conduct was intentional and done through the assertion of legal authority over the Plaintiff.

239. The Defendant Officers' extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff.

240. Wherefore, as a direct and proximate cause of the actions of Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers, the Plaintiff has suffered damages for his physical injuries and their long-lasting after-effects, mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00.

### COUNT IX
### NEGLIGENCE: Negligent Hiring, Negligent Retention, Negligent Supervision, Negligent Infliction of Emotional Distress
### (Against Defendants City of El Paso, John Doe Supervisors, & Allen)

241. The Plaintiff incorporates by reference all prior paragraphs describing the parties and factual allegations, because all such paragraphs are pertinent to this

claim.

242.    All of the individual Defendants named in this Complaint are officials, employees, deputies and/or agents of municipalities.

243.    All acts of the Defendant Officers alleged above were conducted within the scope of the Defendants' employment or duties.

244.    Defendants City of El Paso, John Doe Supervisors, and Allen owed a duty of care to the Plaintiff to exercise reasonable care in hiring, retaining, and supervising its employees.

245.    Defendants City of El Paso, John Doe Supervisors, and Allen knew or should have known of Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers' dangerous character based on prior complaints of excessive force violations and/or background checks including psychological evaluations.

246.    Defendants City of El Paso, John Doe Supervisors, and Allen breached their duty of care to the Plaintiff by failing to properly supervise, provide training, and take remedial measures, such as discharge or reassignment, against their employees to ensure the safety of the Plaintiff.

247.    Defendants Allen and John Doe Supervisors include superior officers to Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers.

248.   Each owed the Plaintiff a duty of care to properly supervise Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers.

249.   Defendants John Doe Supervisors breached their duty of care by not properly supervising Defendants Otero, Guevara, McKinney, Gonzalez, Escajeda, Kiesel, John Doe Supervisors, and John Doe Officers in the April 2018 and April 2019 incidents with the Plaintiff.

250.   As a result of Defendants City of El Paso, El Paso Police Department, John Doe Supervisors, and Allen's negligent acts, the Plaintiff reasonably feared for his safety and has suffered severe emotional distress.

251.   Wherefore, as a direct and proximate cause of the actions of Defendants City of El Paso, John Doe Supervisors, and Allen, the Plaintiff has suffered damages for his physical injuries and their long-lasting after-effects, mental pain, emotional injury and pain, mental anguish, his unlawfully-seized vehicle, his unlawfully-seized money, loss of work, humiliation, and embarrassment, and has suffered damages in an amount in excess of $100,000.00.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiff, WILLIAM HAYWOOD, demands judgment and prays for the following relief, jointly and severally, against all Defendants:

### **A. COMPENSATORY DAMAGES**

As a result of the intentional, reckless, deliberately indifferent, negligent and/or grossly negligent conduct of Defendants as described herein, Plaintiff has sustained injuries and damages as a result of the incidents described herein, such damages including but not limited to the following:

a)  Excruciating physical pain and mental anguish.

b)  Disfigurement.

c)  Loss of earning capacity.

d)  Physical impairment.

e)  Bodily injuries.

f)  Medical, hospital and nursing expenses.

g)  Hedonic damages.

h)  Loss of enjoyment of life.

## B. PUNITIVE DAMAGES

Pleading alternatively and without waiving the foregoing, Plaintiff is entitled to punitive damages because of Defendants' intentional, reckless, and/or deliberately indifferent conduct, malice, and/or gross negligence, in that the acts and omissions, when viewed objectively from the standpoint of Defendants at the time of the occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and of which Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious

indifference to the rights, safety, or welfare of others. Plaintiff is entitled to punitive damages in a sufficient amount to punish Defendants for their intentional, reckless, deliberately indifferent, heedless and/or grossly negligent conduct and to set an example for others that such conduct will not be tolerated.

## C. COSTS, INTEREST AND ATTORNEYS' FEES

Plaintiff seeks prejudgment interest on all monies awarded, as to allow the Defendants to profit from their wrongful conduct would amount to unjust enrichment. Plaintiff seeks all other prejudgment and post judgment interest at the maximum rate as allowed by law. Plaintiff requests an award of reasonable attorneys' fees and costs as allowed by law. Plaintiff seeks all available damages as permitted under law. Plaintiff seeks all penalties, costs, expenses, pre-judgment interest, and attorneys' fees permitted under law. Plaintiff asks that the jury set the amount of his damages. Plaintiff seeks monetary relief, including relief for actual damages suffered, penalties, costs, expenses, pre-judgment interest, and attorneys' fees, over $1,000,000.00.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury of all triable issues, per Fed. R. Civ. P. 38(b).

Respectfully submitted,

DATED:     03/02/2021

_____
ROOK ELIZABETH RINGER, ESQ.
**LENTO LAW GROUP, P.A.**
222 San Marco Ave., Ste. "C"
St. Augustine, FL 32084
904.602.9400 x 467 (Office)
904.299.5400 (Fax)
reringer@lentolawgroup.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY certify that a copy of the forgoing was sent to all attorneys of record, via electronic service via the ECF portal on this _____ day of _____, 2021.

_____
ROOK ELIZABETH RINGER, ESQ.
*Attorney for Plaintiff*